PUBLISHERS NEW PRESS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 63795. Filed May 14, 1964.

*David M. Freedman* and *Bernard Ades,* for the petitioner.

*Leo A. Burgoyne,* for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in the petitioner's income tax for 1951, 1952, and 1953 in the respective amounts of $5,469.57, $30,268.55, and $3,129.58. The issues are (1) whether the amounts of $28,800.04, $158,870, and $153,789.60 received by petitioner in the years 1951, 1952, and 1953, respectively, are includable in its taxable income for those years; (2) whether petitioner failed to report taxable income from newspaper sales in the years 1951, 1952, and 1953 in the amounts of $7,162.56, $30,176.38, and $29,206.66, respectively; and (3) whether petitioner is entitled to a bad debt deduction of $24,311.43 in 1952.

FINDINGS OF FACT

Some of the facts were stipulated and they are so found.

Publishers New Press, Inc., hereinafter called the petitioner, is a corporation organized under the laws of New York with its principal place of business in New York, N.Y. Petitioner filed corporation income tax returns for the years 1951, 1952, and 1953 with the district director of internal revenue, Lower Manhattan, New York, N.Y.

During the taxable years here involved the petitioner was engaged in the business of publishing a daily newspaper known as the Daily Worker on Monday through Friday of each week and a weekly newspaper known as the Worker.

Petitioner's publications were distributed by subscription, by newspaper stands through the Metropolitan News Co. in New York City, and by sale through bundle orders in New York and throughout the United States. The retail price of petitioner's publications was $0.10 per copy. For bundle orders (10 copies minimum), the advertised sales price was $0.075 per copy. Bundle sales were separately recorded on petitioner's books and records, and such sales were denoted as "will-call sales" where the purchaser called for the publications.

At various times the petitioner made public appeals through its publication for funds to keep the publication in operation. One such public appeal under date of October 14, 1951, stated, in part, as follows:

DEAR READERS:

You will agree with us that our first duty as the new owners of The Worker in these critical times is to KEEP IT GOING, keep its courageous message for peace ringing out throughout our beloved country.

\* \* \* \* \* \* \*

In this spirit we report to you that our paper requires immediately $25,000 from its many readers and friends as a minimum to continue publication through the end of this year.

Petitioner entered amounts received as a result of such appeals in an account called "Financial Drive." Petitioner treated these amounts as donated surplus. In Schedule M of petitioner's tax returns (reconciliation of net income and analysis of earned surplus and undivided profits), petitioner showed as "donated surplus" the amounts of $28,800.04, $158,870, and $153,789.60 in the years 1951, 1952, and 1953, respectively.

Petitioner reported the following amounts in its corporation income tax returns for the years 1951, 1952, and 1953:

| Year | Gross receipts | Cost of operation | Gross income (or loss) | Net (loss) |
|---|---|---|---|---|
| 1951 [1] | $72,229.31 | $83,036.21 | ($10,806.90) | ($17,438.76) |
| 1952 | 275,950.07 | 390,601.72 | (114,651.65) | (140,648.67) |
| 1953 | 238,092.40 | 383,722.01 | (145,629.61) | (171,814.56) |

[1] Petitioner was formed sometime in the year 1951.

Respondent made the following determination:

Schedule 1A.

### Explanation of Adjustments

(a) It has been determined that your gross income as disclosed by your Federal income tax returns for the years ended December 31, 1951, December 31, 1952 and December 31, 1953 was understated by omission therefrom of taxable income in the respective amounts of $35,962.60, $189,046.38, and $182,996.26, determined as follows:

|  | 1951 | 1952 | 1953 |
|---|---|---|---|
| (1) Receipts from "will call" sales understated | $1,502.23 | $7,539.48 | $7,035.38 |
| (2) Receipts from "bundles" sales understated | 5,660.33 | 22,636.90 | 22,171.28 |
| (3) Unexplained credits to surplus held to represent taxable income | 28,800.04 | 158,870.00 | 153,789.60 |
| Totals | 35,962.60 | 189,046.38 | 182,996.26 |

It is stipulated that "The figures in the statement attached to the notice of deficiency as to understatements of receipts from 'will call' and 'bundle' sales were determined by respondent by reference to the retail price of 10 cents per newspaper copy sold rather than 7½ cents per newspaper copy sold."

### OPINION

The first issue here is whether the amounts of $28,800.04, $158,870, and $153,789.60 which petitioner received in 1951, 1952, and 1953 by way of contributions from persons and organizations constituted gross income under section 22(a), I.R.C. 1939.[1]

The general definition as set forth in the above cited statute is that gross income "includes gains, profits, and income * * * of whatever kind and in whatever form paid, * * * or from * * * businesses, * * * also from * * * the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever." The Supreme Court of the United States has frequently said the plain meaning of section 22(a) is that it is a catchall provision where Congress was exercising the full measure of its taxing power. See *Commissioner* v. *Glenshaw Glass Co.*, 348 U.S. 426, and cases cited therein.

Petitioner was a stock corporation that was organized for the purpose of carrying on a business for pecuniary profit. It was not a fraternal, charitable, educational, or any form of nonprofit organization such as is often formed to carry out some specified endeavor, where the profits, if any, cannot inure to the pecuniary benefit of anyone. If the corporation had dissolved during any of the years in issue its assets in excess of its debts could have been distributed

---

[1] All section references are to the Internal Revenue Code of 1939, as amended, unless otherwise noted.

pro rata to its stockholders. Petitioner could have declared and paid out of surplus a dividend to its stockholders during any of the years in question. It is significant that in all of the years in issue petitioner's revenue including contributions exceeded costs of operation.

Petitioner received revenue from the sales of its publication and advertising therein. It also received the amounts here in question as a result of its published appeals for money. In these appeals to the readers of its publications it pointed out that the revenue derived from sales and advertising would not meet the costs of operation and it appealed to the readers to send in money without delay to the end that petitioner would be able to continue its publication. These drives for money were an important part of petitioner's business activity. They were continuous and apparently quite sucessful. They produced over $28,000 during the last 3 months of 1951 and over $150,000 a year (or more than half of its gross receipts) for 1952 and 1953.[2]

The record is not clear as to whether some part of the contribution fund was contributed by some stockholders. It may well be that any sums contributed by stockholders would not be gross income. However, the burden was on petitioner and no stockholder or officer of the corporation testified and there was no documentary evidence showing stockholder contributions. All we have is the testimony of the office manager who testified stockholders did contribute but she was unable to state how much any stockholder gave during any of the years in question. Petitioner treated all contributed sums in the same manner on its books without regard to who contributed. And in argument, petitioner treats the questioned receipts as all resulting from the published appeals for funds and no mention is made of stockholders' contributions.

There can be no doubt that if section 22(a) stood alone the contribution fund would be clearly includable in petitioner's gross income. The only provision for the exclusion of the contribution fund from gross income which petitioner argues is here applicable is section 22(b)(3) which provides, in part:

SEC. 22. GROSS INCOME.

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this chapter:

\* \* \* \* \* \* \*

(3) GIFTS, BEQUESTS, DEVISES, AND INHERITANCES.—The value of property acquired by gift, \* \* \*

We have pointed out that the broad phraseology of section 22(a) evidences a congressional policy to tax all gains not specifically

---

[2] Petitioner's office manager testified these contributions were received by petitioner by mail or by personal payment at its office and that the contributors were given receipts and petitioner entered the daily total amounts in its cash book and ledger. A duplicate copy of the receipts was retained but lost or at least not available for the years here involved.

exempted. The Supreme Court has pointed out with reference to section 22(b) that "The exemptions, on the other hand, are specifically stated and should be construed with restraint in the light of the same policy." *Commissioner* v. *Jacobson*, 336 U.S. 28. To qualify as exempt gifts under the above statute there must be present in the transfer all of the essential elements of a valid gift. In *Commissioner* v. *Duberstein*, 363 U.S. 278, the Supreme Court stated that if a payment "proceeds primarily from 'the constraining force of any moral or legal duty,' or from 'the incentive of anticipated benefit' of an economic nature * * * it is not a gift. And, conversely, 'Where the payment is in return for services rendered, it is irrelevant that the donor derives no economic benefit from it.'" The Supreme Court also indicated that a gift in the statutory sense proceeds from a "detached and disinterested generosity" and that in this regard the most critical consideration was the transferor's intention. The mere absence of a legal consideration for the payment does not make the payment a gift under this statute. *United States* v. *McCormick*, 67 F. 2d 867, and *Poorman* v. *Commissioner*, 131 F. 2d 946, affirming 45 B.T.A. 73. The funds in question were contributions furnished by the contributors to obtain something the contributors desired. They were funds furnished in each instance by a person or organization in common with others for a common purpose, namely, the continued publication by petitioner of the newspaper. There is no indication that those who sent in money intended a gift.

In *Teleservice Co. of Wyoming Valley*, 27 T.C. 722, affd. 254 F. 2d 105, a case somewhat analogous to the situation before us, we held that payments made by prospective customers to a corporation to finance a community television antenna system were not gifts or contributions to capital but were part payment for services rendered or to be rendered and therefore includable in the corporation's gross income. In so holding, we pointed out that "the only way that the [corporation] could be induced to give service was by receipt of something in addition to the monthly charge, namely, contributions to enable it to construct extensions of the antenna system." Similarly, it can be said here that the only way petitioner could continue to perform its service of publishing a newspaper was by soliciting contributions over and above the amounts actually charged in the sales of newspapers.[3]

Petitioner here is in much the same situation with respect to receiving contributions as was the taxpayer in *Edward F. Webber*, 21 T.C. 742, affd. 219 F. 2d 834. There the taxpayer, a Methodist minister who conducted religious programs over radio, solicited funds from listeners to ensure continuation of the programs. We held funds re-

---

[3] We have shown in our findings of fact that petitioner incurred net losses of $17,438.76, $140,648.67, and $171,814.56 in the years 1951, 1952, and 1953, respectively, and that during these years it received contributions of $28,800.04, $158,870, and $153,789.60, respectively.

ceived in response to such solicitations were not gifts under section 22(b) and that they were includable in the taxpayer's gross income under section 22(a). At page 744 of our opinion, we stated, as follows:

There is no indication that the petitioners failed to make clear, in their solicitation of funds, the necessity for funds to ensure continuation of the programs. Such funds would include expenses and adequate compensation for the petitioners. Those who sent money to the petitioners were under no legal obligation to send the money but, apparently, enjoyed the programs, wanted them to continue, and were moved by some moral obligation or desire to compensate the petitioners and enable them to continue their broadcasts. * * *

In affirming our opinion in the *Webber* case, the Court of Appeals (10th Circuit) pointed out there was nothing in the record of that case which would indicate "personal gifts as distinguished from contributions to the perpetuation of the programs which the contributors enjoyed and desired to financially support." Here the record is even stronger for the published appeals frankly stated the publication of the newspaper would cease unless the contributions were made without delay. The plain implication is that the funds received in response to such appeals were not exempt gifts.

Petitioner cites *Bail Fund of the Civil Rights Congress of N.Y.*, 26 T.C. 482, as support for its position. Under totally different circumstances we found as a fact that certain contributions to the taxpayer (an unincorporated association run by a board of trustees), which were to be used to furnish bail for persons held in custody in certain types of cases, were gifts and were not includable in gross income. That case is clearly distinguishable. It is obvious the association was some sort of a nonprofit organization for its normal operation would not be the conduct of a business. Its operation could not result in a pecuniary profit for anyone.

In effect, the private contributions here were made in consideration of the performance of the petitioner's normal business function of publishing a newspaper. See *Teleservice Co. of Wyoming Valley*, *supra*. We cannot find that the amounts contributed to petitioner were gifts within the statutory meaning. We hold that the contributions received by petitioner in the years 1951, 1952, and 1953 in the respective amounts of $28,800.04, $158,870, and $153,789.60 are includable in its gross income for those years under section 22(a).

The second issue is the correctness of respondent's determination that petitioner had unreported sales receipts on its so-called bundle sales or will-call sales. It is stipulated that respondent determined the understatements of receipts on these sales "by reference to the retail price of 10 cents per newspaper copy rather than 7½ cents per newspaper copy sold."

Petitioner's office manager testified that bundle orders were sold for

no more than $0.075 per copy, while presumably the sales to subscribers or through newsstands were made at the full retail price of $0.10 per copy. Petitioner introduced in evidence a page from its newspaper (dated October 14, 1951) which contains a coupon for bundle orders to be filled and mailed in. The coupon states the price of such bundle orders (10 copies minimum) to be $0.075 per copy. It appears that such bundle sales were separately recorded on petitioner's books and records, presumably at the reduced price. Respondent merely complains on brief that petitioner has failed to introduce in evidence any names of its distributors or subscribers and "material records" of its customers. We feel, however, that petitioner has sufficiently shown that its bundle orders were sold at not more than $0.075 per copy. Petitioner is sustained on this issue.

The last issue is whether petitioner is entitled to a deduction for purported bad debts in 1952 in the amount of $24,311.43. There is some confusion surrounding this item. It appears that this amount was never claimed as a deduction by petitioner in its 1952 tax return.[4] Petitioner raised this issue in paragraph 4(d) of its petition, where the allegation is made that the respondent "erroneously refused to allow petitioner to deduct from its 1952 gross income bad debts of $24,311.43, consisting of $14,834.58 due it for 'bundles' sales of its newspapers, and $9,476.85 due it for advertisements which it published in its newspaper." At the trial petitioner's witness testified that this disputed amount "could have been called bad debts but I do think more correctly a reduction of income."

About all the concrete evidence we have in the record is that this amount was written off on petitioner's books in 1952. Whether we regard the petitioner's argument to be a claim for a bad debt deduction or, somehow, a reduction of income received from its subscribers and advertisers, the result on this record must be the same. Petitioner has the burden on this issue. There is no evidence as to the identity of the various debtors, no evidence as to whether such debts or receivables had any value at the beginning of the taxable year 1952,[5] and no evidence as to the identifiable events in 1952 which

---

[4] In his opening statement at the trial petitioner's attorney explained this item as follows:

The third question is that we have in 1952 made a deduction for claimed losses on accounts receivable for bundle sales and for advertising, and we have offset that in the books against the amount that was collected and which was called donated capital, or donated surplus. In actuality, these were deductions. They were not taken off as deductions primarily because there was no profit from which they could be taken off but there was an accumulation of donated surplus and it was taken off against that. But, in essence, these were deductions for bad debts or accounts receivable uncollectible. * * *

[5] In paragraph 5(d) of its petition the petitioner states that it relies upon the following facts in this proceeding:

(d) During the years 1951, 1952 and 1953 debts aggregating $24,311.43, consisting of $14,834.58 due it for "bundles" sales of its newspapers and $9,476.85 due it for advertisements which it published in its newspaper, became bad and uncollectible and were determined to be so during said years by petitioner.

indicated the worthlessness of the debts or receivables during that year. Petitioner has failed completely to meet its burden on this last issue.

*Decision will be entered under Rule 50.*