JORDON AND ESSIE PERLMUTTER, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1785–63—1787–63, 1972–64—1974–64. Filed December 27, 1965.

*Gene W. Reardon*, for the petitioners.
*Arthur B. Bleecher*, for the respondent.

---

[1] Proceedings of the following petitioners are consolidated herewith: William and Ruth Morrison, docket Nos. 1786–63 and 1974–64; Samuel and Fern Primack, docket Nos. 1787–63 and 1973–64; and Jordon and Essie Perlmutter, docket No. 1972–64.

These cases were heard by Judge Morton P. Fisher and briefs were duly filed. Judge Fisher died on Feb. 11, 1965. These cases, not having been disposed of, were reassigned to Judge Theodore Tannenwald, Jr., on Aug. 4, 1965, and notice was given to the parties that any request for rehearing or reargument might be presented to him within 30 days. No such requests have been received.

TANNENWALD, *Judge:* Respondent determined deficiencies in petitioners' income tax returns for the years and in the amounts as follows:

| Petitioners | Docket No. | Year | Deficiency |
|---|---|---|---|
| Jordon and Essie Perlmutter | 1785–63 | 1958<br>1959 | $60,825.64<br>67,782.81 |
| | 1972–64 | 1961 | 1,610.34 |
| William and Ruth Morrison | 1786–63 | 1958<br>1959 | 61,349.95<br>68,085.86 |
| | 1974–64 | 1961 | 1,652.51 |
| Samuel and Fern Primack | 1787–63 | 1958<br>1959 | 61,324.08<br>67,814.96 |
| | 1973–64 | 1961 | 1,644.15 |

The above six docket numbers have been consolidated for trial and decision. In docket Nos. 1785–63, 1786–63, and 1787–63, the respondent has conceded certain issues which substantially reduce the deficiencies set forth in the statutory notice. Also in those docket numbers the petitions were amended to claim additional deductions for charitable contributions which would result in the Court finding overpayments of taxes by petitioners and awarding refunds.

The threshold question presented for decision is whether or not the transfers of three parcels of land to school districts and one parcel of land to a recreation district are deductible charitable contributions under section 170 of the Internal Revenue Code.[2] Since we decide the threshold question in the negative, we confine our findings to those facts necessary to that decision. Similarly, it is unnecessary for us to decide the fair market value of the land transferred, or the correct method of measuring any charitable deduction to which petitioners might otherwise have been entitled.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

During the taxable years 1958, 1959, and 1961, petitioners were residents of the State of Colorado and timely filed their joint returns for those years on a calendar year basis with the district director of internal revenue, Denver, Colo. Any reference herein to petitioners shall be in reference to Jordon Perlmutter, William Morrison, and Samuel Primack, their wives being parties to this proceeding only by reason of having filed joint returns with them.

The Perl-Mack Construction Co. (hereinafter sometimes referred to as Perl-Mack) was a partnership organized in 1952 with petitioners being its three equal partners. The partnership engaged principally in the business of subdividing large tracts of land, build-

---

[2] Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended.

ing and selling houses, and developing and building commercial properties in the greater Denver area. The partnership kept its books and filed its Federal partnership returns on a fiscal year basis ending February 28. The partnership information returns, Forms 1065, for the fiscal years ended February 28, 1958, 1959, and 1961 (hereinafter referred to as fiscal years 1958, 1959, and 1961, respectively), were timely filed with the district director of internal revenue, Denver, Colo.

Perl-Mack constructed and sold homes in two subdivisions, Perl-Mack Manor and Northglenn, during the period with which we are concerned. Both subdivisions are located in Adams County, Colo.

During the period that Perl-Mack subdivided Perl-Mack Manor and Northglenn, the Adams County Planning and Zoning Board had subdivision regulations in effect which had been adopted November 22, 1954. The regulations had as a general requirement the following:

### Section 5—PUBLIC SPACES.

(1) Allocation of Land for Public Spaces. The owner of the land in each subdivision shall allocate, and convey eight per cent of the gross area of the land in his subdivision for park, playgrounds, schools, recreational or similar public purposes, at such location as designated by the County, or at the option of the County, said owner shall in lieu of such conveyance of land in kind, pay to the County in cash an amount equal to eight per cent of the value of the land. If the County and the owner fail to agree on the value of said land, such land shall be fixed and established by a Real Estate Appraisal by qualified and licensed appraisers. The proceeds of said payments shall be deposited in a separate County account and shall be used only for the acquisition of land for parks, playgrounds, schools, recreational or similar public purposes.

Under article III, entitled "Procedure," the regulations provided that the subdivider was to file with the building inspector a preliminary layout of the proposed subdivision which contained the location of the land to be conveyed or reserved for public use or a statement that payment in lieu thereof would be made. The regulations further provided that, after approval of the preliminary layout, the subdivider might file with the planning commission a final layout, which was to include a conveyance to the county of the land set aside for public use or the payment in lieu of conveyance of land.

On October 21, 1957, which was within its fiscal year 1958, Perl-Mack transferred to school district No. 50, Adams County, Colo., 8.731 acres of vacant land in its Perl-Mack subdivision, legally described as lot 16, block 51, Perl-Mack Manor, eighth filing, Adams County, Colo. Perl-Mack's cost basis for the land was $21,750.

On April 25, 1958, which was within its fiscal year 1959, Perl-Mack Construction Co. transferred to school district No. 50, Adams County, Colo., 10.818 acres of vacant land in its Perl-Mack Manor subdivision, legally described as lot 13, block 15, Perl-Mack Manor, 12th filing, Adams County, Colo. Perl-Mack's cost basis for the land was $32,454.

On February 10, 1959, which was within its fiscal year 1959, Perl-Mack Construction Co. transferred to school district No. 1, Adams County, Colo., 7.416 acres of vacant land in its Perl-Mack Manor subdivision, legally described as lot 1, block 1, Perl-Mack Manor, 15th filing, Adams County, Colo. Perl-Mack's cost basis for the land was $10,456.56.

On May 10, 1960, which was within its fiscal year 1961, Perl-Mack Construction Co. transferred to recreation 2.004 acres of vacant land in its Northglenn subdivision, legally described as lot 2, block 11, Northglenn, second filing, Adams County, Colo. Perl-Mack's cost basis for the land was $2,004.

On its returns for the years of transfer, Perl-Mack reported its basis of the transferred land as part of the cost of goods sold, which treatment is not contested by respondent. As a consequence, each of the petitioners received the benefit of a corresponding deduction.

Neither Perl-Mack Construction Co. nor any of the petitioners in their respective returns claimed charitable contribution deductions for the transferred land, with the exception of the swimming pool site transferred in the fiscal year 1961. With regard to that transfer, the partnership on its return declared a charitable contribution of $7,996, which was stated as being the difference between the alleged fair market value of $10,000 and its basis of $2,004. The partners each took one-third of the $7,996 in their returns for 1961.

There was no evidence of any instance where a plat filing (i.e., layout) was offered without a dedication of 8 percent or more of the total acreage involved or payment of cash in lieu thereof.

At no time during the period did Perl-Mack or any of the partners protest, or bring legal proceedings to question, or otherwise object to the provisions of the Adams County regulations involved herein, or fail to comply with such provisions.

Petitioners believed that the constitutionality of the Adams County regulations was open to question.

Petitioners were instrumental in petitioning for and having created the Northglenn Metropolitan Recreation District.

Perl-Mack publicized its subdivisions as "planned communities" with accompanying parks, schools, churches, recreational facilities, and shopping centers. It specifically advertised the availability of schools in Perl-Mack Manor. The swimming pool that was constructed on the fourth parcel of land was advertised by Perl-Mack to prospective buyers of homes in Northglenn.

The facilities built on the transferred land made the residences offered for sale by Perl-Mack more attractive and enhanced the potential resale value of the homes Perl-Mack sold in Perl-Mack Manor and Northglenn.

In the case of all four of the transfers, the transferees qualify under the provisions of section 170(c)(1) of the Internal Revenue Code of 1954 and the property was to be used exclusively for public purposes.

## ULTIMATE FINDINGS

Petitioners, through Perl-Mack, acted under the ostensible compulsion of compliance with a colorable legal requirement in transferring the three parcels of land in Perl-Mack Manor to the school districts and the one parcel of land in Northglenn to the Northglenn Metropolitan Recreation District.

Petitioners benefited from the transfers by avoiding difficulty in obtaining approval of their building plans for Perl-Mack Manor and Northglenn and by enhancement of the value of the remaining proper ties in these subdivisions.

## OPINION

The sole issue for decision is whether or not petitioners as partners of Perl-Mack Construction Co. are entitled to a deduction under section 170 [3] for alleged charitable contributions represented by three parcels of land transferred to school districts and a parcel of land transferred to a recreation district. It is conceded that the recipients were organizations referred to in section 170(c)(1) and we have found that the transferred land was to be used for public purposes. The sole question, therefore, is whether or not each of the transfers was a "contribution or gift" within the meaning of the statute.

During the years in question, petitioners were members of a partnership engaged in the development of land subdivisions in Adams County, Colo., and the construction and sale of residences thereon. The subdivisions were publicized as "planned communities" with accompanying parks, schools, churches, recreational facilities, and shopping centers. Indeed, the partners were instrumental in the creation of the Northglenn Metropolitan Recreation District, to which one of the parcels of land was transferred.[4] Unquestionably the existence of these

---

[3] SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

    (a) ALLOWANCE OF DEDUCTION.—

        (1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year * * *

    \*        \*        \*        \*        \*        \*        \*

    (c) CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

        (1) A State, a Territory, a possession of the United States, or any political subdivision of any of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes.

[4] It is of interest to note that subsequent to the transfer of the parcel to the Northglenn Metropolitan Recreation District, Perl-Mack expended some $36,000 for the construction of a swimming pool thereon for which no charitable deduction is claimed. Presumably this is because Perl-Mack felt it had already received the full tax benefit through the addition of such amount to the cost of the remaining lots.

ancillary facilities made the residences offered for sale by the partnership more attractive, to the buying public and enhanced their potential resale value to the purchasers.

The subdivision regulations of the Adams County Planning and Zoning Board in effect during the years in question required subdivision landowners to allocate and convey 8 percent of the gross area of the land in question, such location to be designated by the county, for "parks, playgrounds, schools, recreational or similar public purposes" or, at the option of the county, make a cash payment in lieu thereof. The regulations also required that the preliminary layout specify the land conveyed or reserved for such purposes or contain a statement that payment would be made in lieu thereof and further required that the final layout actually include a conveyance of such land and/or payment in cash in lieu thereof. While the testimony was not conclusive as to whether the county authorities would have withheld approval of the partnership plans if the land had not been transferred, the testimony indicated that no plat (i.e., layout) had ever been approved without the required conveyance or payment. Nor was there any evidence that the partnership at any time protested, objected to, or otherwise failed to comply with the regulations involved herein. We are satisfied that, absent the transfers, the partnerhip would at least have had considerable difficulty obtaining approval of its plans.

At the trial, petitioners' witnesses testified that petitioners had been advised by counsel prior to the fiscal 1961 transfer that the Adams County regulations were unconstitutional but no evidence was presented of any court proceedings, brought by the petitioners herein or anyone else so holding, nor have we as a result of our own research uncovered any such decisions. The only testimony bearing directly on the legal issues involved was that of petitioners' counsel, who, in the course of testifying as to the basis of his opinion, stated that there had been a case in another county in Colorado in which the district court of that county had held that a "very similar provision" was unconstitutional. He did not, however, choose to enlighten the Court as to the specifics either of the provision or the court decision.

Petitioners insist that, because of the advice they received as to the unconstitutionality of the Adams County regulations, the transfers were voluntary acts of generosity on their part induced without regard to any requirements of law or to any anticipated business benefit. Respondent, on the other hand, maintains that petitioners have not evidenced that donative intent which is the requisite of a gift.

The phrase "charitable contribution," as used in section 170, is synonymous with the word "gift." *Harold DeJong*, 36 T.C. 896, 899

(1961), affd. 309 F. 2d 373 (C.A. 9, 1962) ; *Channing* v. *United States*, 4 F. Supp. 33, 34 (D. Mass. 1933), affirmed per curiam 67 F. 2d 896 (C.A. 1, 1933), certiorari denied 291 U.S. 686.

The decided cases delineate various roots from which the tree of a "gift" derives its strength. We are told that a gift must proceed from a "detached and disinterested generosity," *Commissioner* v. *LoBue*, 351 U.S. 243, 246 (1956) ; "out of affection, respect, admiration, charity or like impulses," *Robertson* v. *United States*, 343 U.S. 711, 714 (1952) ; not from "the constraining force of any moral or legal duty" nor from "the incentive of anticipated benefit" of an economic nature, *Bogardus* v. *Commissioner*, 302 U.S. 34, 41 (1937). We are further told, on the one hand, that the controlling factor is "motive," i.e., what was the basic reason for the conduct or the dominant reason that explains the action in making the transfer, *Commissioner* v. *Duberstein*, 363 U.S. 278, 286 (1960), and, on the other hand, that consideration is the primary concern and that we should avoid confounding motive with legal consideration or expectation with legal rights, *Wardwell's Estate* v. *Commissioner*, 301 F. 2d 632, 636 (1962), reversing 35 T.C. 443 (1961).

At the outset, it should be noted that most of the cases in the gift area do not involve charitable contributions but rather deal with situations where the payments were in varying degrees connected with services rendered by the recipients. It does not necessarily follow that the principles underlying these cases are fully applicable in the area of charitable contributions such as is involved herein. In any event, we see no need to cut our way through the thicket of subjective and occasionally ephemeral concepts with which the decided cases bristle.

It is enough for us to hold that on all the facts and circumstances of this case it would "overtax imagination" for us to sustain the transfers herein as charitable contributions within the meaning of section 170. *Detroit Edison Co.* v. *Commissioner*, 319 U.S. 98, 100 (1943). Whatever may have been petitioners' belief as to the constitutionality of the Adams County regulations, they acted under the ostensible compulsion of compliance with a colorable legal requirement.[5] In this connection, it is significant that petitioners' own counsel testified that "they [petitioners] had no desire to battle regarding this matter." Nor need we decide whether the Adams County regulations were in fact constitutional. There is a rebuttable presumption that the regulations were valid. *Euclid* v. *Ambler Co.*, 272 U.S. 365 (1926) ; *City of Denver* v. *Knowles*, 17 Colo. 544, 30 Pac. 1041 (1892). And, as we have previously pointed out, they have not been authoritatively declared invalid by any court as far as we have been able to determine.

---

[5] It is not necessary for us to go beyond this criterion and elaborate on the problem of whether other forms of compulsion of a nonlegal nature would preclude a finding that a particular transfer was not deductible as a charitable contribution.

What is more, petitioners received a direct benefit because of the transfer. It appears from the evidence that even if the partnership might have ultimately prevailed in its efforts to get approval of its plans without making the transfers, it certainly avoided considerable and perhaps protracted difficulty in this regard by making the transfers in question. See Rev. Rul. 57–488, 1957–2 C.B. 157–158. The existence of the schools and the recreational facilities constructed on the transferred land directly affected the value of the remaining properties in the hands of petitioners' partnership. The occupancy of the residences offered for sale by the partnership was made more attractive to the buying public and their potential resale value in the hands of purchasers was enhanced. The facilities helped to make credible the "sales pitch" of the partnership that their subdivisions were "planned communities."

The direct benefit inuring to petitioners is to be distinguished from the incidental benefit which inures to the general public from some transfers for public purposes and thus indirectly to the transferors as members thereof. Cf. *Toole* v. *Tomlinson,* —— F. Supp. —— (D. Fla. 1963), and *Citizens & Southern National Bank of South Carolina* v. *United States,* 243 F. Supp. 900 (W.D.S.C. 1965), where neither taxpayer acted under the compulsion of any legal requirement.[6]

We believe that the most that can be said is that petitioners made the transfers as the result of "economic and business pressures"—some subtle and some not so subtle. See *Max Kralstein,* 38 T.C. 810, 818 (1962); cf. *Publishers New Press, Inc.,* 42 T.C. 396 (1964); *Philadelphia & Reading Relief Association,* 4 B.T.A. 713 (1926). In our judgment Judge Brewster in *Channing* v. *United States,* 4 F. Supp. 33 (D. Mass. 1933) succinctly set forth the fundamental reason why petitioners should be denied a deduction under section 170, when he stated at page 34:

When the purpose of the legislation is considered, any rational meaning given to the language of the statute will not admit of the deduction of payments made upon full consideration. The obvious and rational meaning is to be preferred to any curious sense that only "the ingenuity and study of an acute and powerful intellect would discover." Mr. Justice Sutherland in Lynch v. Alworth-Stephens Co., 267 U.S. 364, 370, 45 S. Ct. 274, 276, 69 L. Ed. 660. It can be said of the statute under consideration, as was said of other provisions of income tax laws, "that the words of the statute * * * do not refer to some esoteric concept derived from subtle and theoretic analysis." Mr. Justice Roberts in Old Colony R. Co. v. Commissioner, 284 U.S. 552, 561, 52 S. Ct. 211, 214, 76 L. Ed. 484. These observations can appropriately be applied to taxing acts. Old Colony R. Co. v. Commissioner, supra; De Ganay v. Lederer, 250 U.S. 376, 381, 39 S. Ct. 524, 63 L. Ed. 1042.

[6] It may be that in *Toole* v. *Tomlinson* the contribution was not the land itself but the waiver of the taxpayer's right to compensation which would have arisen if his property had been taken by eminent domain.

Finally, we note that Samuel Primack, one of the partners of Perl-Mack Construction Co., at one point stated in his testimony that "all of the transfers were well in excess of any 8 percent figure." He conceded, however, that he could not tell the exact amount of the excess in the Perl-Mack Manor area; with respect to Northglenn, he merely stated that the figure was "probably somewhere closer to 10 percent." There was no further testimony on this score and, on the record before us, we are unable to determine whether, in fact, an excess was transferred. We conclude that the evidence is too meager for us to determine whether there was an excess and we therefore do not reach the question whether such excess, if it existed, was deductible. Cf. *Harold DeJong, supra.* We think that, whether the transfers were voluntarily or involuntarily made and irrespective of the underlying motivations, they represented a business expenditure of a capital nature and that petitioners have already received the maximum benefit through being allowed to add the cost basis of the transferred lands to the cost basis of the remaining property. *Sevier Terrace Realty Co.,* T.C. Memo. 1962–242, affirmed per curiam 327 F. 2d 999 (C.A. 6, 1964); *Woodside Mills* v. *United States,* 260 F. 2d 935 (C.A. 4, 1958), approving Rev. Rul. 57–488, *supra; Country Club Estates, Inc.,* 22 T.C. 1283 (1954).

Reviewed by the Court.

> *Decisions will be entered under Rule 50 in docket Nos. 1785–63, 1786–63, and 1787–63.*
> *Decisions will be entered for the respondent in docket Nos. 1972–64, 1973–64, and 1974–64.*

DRENNEN, *J.,* concurs in the result.

---

FAY, *J.,* concurring: I agree with the majority that the transfers of property in question, because petitioners received a direct benefit therefor, do not qualify as charitable contributions under section 170(c). However, I believe that the only direct benefit received by petitioners from the transfers was the avoidance of "considerable and protracted difficulty" in obtaining the county's approval of their development plans.[1] I disagree with the majority opinion to the extent to which it implies that the existence of school and recreational facilities on the transferred land also constitutes a direct benefit which alone would disqualify the transfers as charitable contributions. Such benefit seems to me to be of an incidental nature.

---

[1] Or the county's approval itself if the regulation requiring the transfers was constitutionally valid.