ARTHUR BRAVER and ANNETTE H. BRAVER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Braver v. Commissioner
Docket No. 1986-71.
United States Tax Court
T.C. Memo 1973-84; 1973 Tax Ct. Memo LEXIS 205; 32 T.C.M. (CCH) 370; T.C.M. (RIA) 73084; April 10, 1973, Filed. Arthur Braver, pro se. Randolph D. Mason, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Taxable Year
Deficiency 1965
$155.78
1966
143.05
1967
104.30 2 Petitioners have claimed an overpayment of $459.44 for the year 1967. The parties orally stipulated at the trial of this case that there are deficiencies in Federal income taxes for the taxable years 1965 and 1966 in the amounts of $155.78 and $118.95, respectively. *206 At issue is whether the petitioners are entitled to a charitable contribution deduction in 1967 for a transfer of a family burial plot by Annette H. Braver to the Congregation Agudas Achim and, if so, the amount thereof. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Arthur Braver and Annette H. Braver (herein called petitioners) are husband and wife whose resident was Silver Spring, Maryland, when they filed their petition in this proceeding. They filed timely joint Federal income tax returns for the years 1965, 1966 and 1967, and a joint amended income tax return for 1967, with the district director of internal revenue at Baltimore, Maryland. Ella Harris, the mother of Annette H. Braver, purchased a cemetery plot, consisting of eight grave spaces, from the Congregation Agudas Chim (herein referred to as the synagogue) for $500. The deed subjected the plot to any charges to be assessed in the future to maintain it. The plot was paid for on February 8, 1942. Ella's husband, Alex Harris, was buried in one of the eight grave spaces. Annette Braver was 16 years of age when the burial plot was purchased by her mother. 3 Ella *207 Harris died in 1948. Her will, executed on January 29, 1946, was probated in Travis County, Texas. Annette Harris Braver, who qualified as the executrix of the estate, was left all the real and personal property owned by Ella Harris at the time of her death. There was no specific disposition of the grave spaces in the family burial plot made in the will. Mrs. Braver was the beneficiary under the residuary clause. In 1951 the synagogue established the practice of covering grave plots with perpetual care arrangements. In December 1965, the synagogue contacted Dr. Harold J. Harris, the brother of Annette Braver, seeking permission to bury Sophie Sack in one of the grave spaces of the Harris family plot. Sophie Sack was related to the wife of Harold Harris. By telegraph dated December 4, 1965, Harold Harris gave his permission for the burial of Sophie Sack in the Harris family plot. On January 26, 1967, Arthur Neuman, Chairman, Cemetery Committee, of the synagogue wrote a letter to Dr. Harold Harris which reads, in part as follows: There is a balance of $323, charged for maintenance of this plot which has accumulated over the years. In order to resolve this balance and *208 to prevent its continuing increase by additional yearly maintenance charges, we would like to offer a suggestion which may be agreeable to you. In consideration of a notarized statement from you, returning to Congregation Agudas Achim all unused graves on Row O, Lot 6, Section 1 of our Agudas Achim Cemetery 4 at Crockett & Palmetto Streets, we will guarantee perpetual care without further charge for the maintenance of the graves of Alex Harris and Sophie S. Sack, and wipe off the outstanding balance of the previously accumulated maintenance charge of that plot of $323. Harold Harris was in agreement with the synagogue's proposed offer, and sent to Annette Braver for her approval a notarized statement purporting to return the grave spaces to the synagogue. On April 12, 1967, Annette Braver wrote to the synagogue and stated that she was the sole owner of the grave spaces in the Harris family plot and that the synagogue's proposed disposition, to which her brother had agreed, was not satisfactory to her. She further stated that she would have Sophie Sack removed from the plot unless Sophie's family paid the synagogue the current market value of the grave space plus the value *209 of a perpetual care arrangement. She stated that the amount of money received by the synagogue in this regard would be applied toward any cemetery maintenance expenses owing on the plot, with any balance considered as a contribution to the synagogue. On July 3, 1967, the synagogue wrote Annette Braver and informed her that arrangements had been made for the payment of $400 by Sophie Sack's family in connection with the Sack grave space. The synagogue informed Mrs. Braver of its regulation that prohibits an owner of a grave space from transferring or selling a space to anyone other than the synagogue, and requested that she convey the Sophie Sack 5 grave space to the synagogue. The synagogue also stated that in view of the fact that Mrs. Braver was claiming to be the owner of the grave spaces that she was liable for the accumulated maintenance charges. In view of paragraph 7 of the cemetery regulations requiring all grave spaces to be covered by perpetual care arrangements, the synagogue also asked Mrs. Braver to cover the plot with a perpetual care arrangement that would cost her $1,200. On July 17, 1967, Annette Braver replied to the synagogue's letter dated July 3, 1967, and *210 transmitted a proposed deed stating that she was "donating" not "selling" the Sophie Sack grave space. It also would have transferred her father's grave and the six remaining unused grave spaces to the synagogue. On July 19, 1967, Mark Bartman, Executive Director of the synagogue, wrote a letter to Mrs. Braver which reads, in part as follows: Under current prices, one (1) grave space is $400.00 for a member, including Perpetual Care; and double that amount for a non-member. Six (6) grave spaces are $1200.00 and double that amount for a non-member. Eight (8) grave spaces are $2000.00 and double that amount for a non-member, all the above in conformance with the copy of Cemetery Rules and Regulations we had sent you. In consideration of this granting, donating and conveying to us, the Alex Harris Plot, we will free this plot of all debts and encumbrances; we will also be free to resell the unused grave spaces on this plot and will certify to you Perpetual Care for the grave of Alex Harris. 6 On August 8, 1967, Annette Braver executed a deed of transfer which provides, in pertinent part, as follows: KNOW ALL MEN BY THESE PRESENTS, that I, Annette P. Harris Braver, Independent *211 Executrix of the Estate of Ella Harris, Deceased, duly authorized by such qualification and authority; have GRANTED, DONATED AND CONVEYED to Congregation Agudas Achim of San Antonio, Texas, County of Bexar, all that certain tract or parcel of land in Agudas Achim Cemetery at Crockett and Palmetto Streets, known as Row O, Section 1, known as the Alex Harris plot. The Alex Harris Plot consists of eight grave spaces, one of which is occupied by Alex Harris, deceased, and one of which is occupied by Sophie S. Sack, deceased. The above described Alex Harris plot is free of all debts and encumbrances. In August 1967, the synagogue executed a deed conveying the Sack grave space to three people, apparently relatives of Sophie Sack, for $200. In consideration for an additional $200, the synagogue contracted with those three people to provide for the perpetual care of that grave space. The Rules and Regulations of the synagogue provide, in part, as follows: SECTION 12. RESALE: No grave space may be transferred or assigned or resold by the owner except to the Congregation. The price paid by the Congregation shall be determined by the Board of Trustees but in no event shall exceed the *212 original purchase price. Under no circumstances shall the Congregation be required to repurchase any such grave spaces. Annette Braver was not a member of the synagogue in 1967. She then lived in Silver Spring, Maryland, and did not intend to return to Texas or to be buried in the Harris family plot. 7 Other than the information as to values of the grave spaces provided to them by the synagogue, the petitioners had no personal knowledge as to the values of the grave spaces in the Harris family plot in 1967. On April 14, 1971, after filing their petition herein, the petitioners filed an amended Federal income tax return for 1967 claiming a charitable contribution deduction of $2,400 for the conveyance of the grave spaces to the synagogue. OPINION It is our view that the petitioners are not entitled to a charitable contribution deduction for Mrs. Braver's conveyance of the remaining grave spaces to the synagogue. We think the conveyance of the property did not constitute a "charitable contribution" within the meaning of section 170 of the Code and the regulations thereunder.
The general principles applicable to this case are succinctly stated in Harris W. Seed, 57 T.C. 265, 275 (1971): *213 It is well settled that the term "charitable contribution" as it is used generally in section 170 and the regulations is synonymous with the word "gift." Harold DeJong, 38 T.C. 896, 899, affirmed 309 F.2d 373, 376-379 (C.A. 9); Jordon Perlmutter, 45 T.C. 311, 316-317; James A. McLaughlin, 51 T.C. 233, 234, affirmed per curiam in an unreported opinion ( C.A. 1, May 28, 1969, 23 A.F.T.R. 2d 69-1763, 69-2 U.S.T.C. par. 9467); Edward A. Murphy, 54 T.C. 249, 252; Harold E. Wolfe, 54 T.C. 1707, 1713; Larry G. Sutton, 57 T.C. 239, 242; cf. Sarah Marquis, 49 T.C. 695, 702. "A gift is generally defined as a voluntary transfer of property by the owner to another 8 without consideration therefor. If a payment proceeds primarily from the incentive of anticipated benefit to the payor beyond the satisfaction which flows from the performance of a generous act, it is not a gift." Harold DeJong, 36 T.C. at 899, affirmed 309 F.2d 373 (C.A. 9). The cases have therefore sought to distinguish between any direct benefit inuring to the transferor of property *214 to a recipient described in section 170(c) and the benefit which inures to the general public from the transfer and indirectly to the transferor. Jordon Perlmutter, 45 T.C. 311, 318; Edward A. Murphy, 54 T.C. at 252-253; Citizens & Southern National Bank of South Carolina v. United States, 243 F.Supp. 900 (W.D.S.C.). Putting aside techical legal arguments, [1] it is clear to us that the conveyance in question proceeded primarily from an incentive of anticipated benefit to Mrs. Braver and, as such, did not constitute a gift. Prior to the conveyance the synagogue had assessed $323 against her for accumulated maintenance charges and had notified her that she would have to pay for perpetual care costing $1,200 to cover the entire burial plot. With knowledge that she could not receive more than $500 (the original purchase price) from the synagogue, the burial plot was obviously a liability to her at that time (1967) because she had no intention of returning to Texas or to 9 be buried there. Under the final agreement with the synagogue, Mrs. Braver received in return for the conveyance of the remaining grave spaces the forgiveness of her indebtedness *215 for accumulated maintenance charges and future perpetual care. She received a quid pro quo. There was no "net" gift in any amount. Cf. Harold DeJong, 36 T.C. 896, 899-900 (1961), affirmed 309 F.2d 373 (C.A. 9, 1962); Charles O. Grinslade, 59 T.C. No. 56 (January 29,1973). Consequently, we must disallow the claimed deduction. Having so concluded, we need not consider other contentions advanced by the parties. Decision will be entered under Rule 50. i Footnotes
1. Respondent has launched a multiple attack against the claimed deduction, arguing (1) that Mrs. Braver had only a contingent, inalienable right of interment in the grave spaces; (2) that her conveyance to the synagogue was null and void under Texas law; (3) that the grave spaces had no "fair market value" because they were not marketable in Mrs. Braver's hands; (4) that, in any event, they were worth only 437.50 (the most the synagogue could pay); and (5) that Mrs. Braver lacked the requisite donative intent. ↩