KAVI E. MORTON, JR. and HELENE L. MORTON and HAROLD C. MORTON and GRACE M. MORTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Morton v. Commissioner
Docket No. 1873-77.
United States Tax Court
T.C. Memo 1979-484; 1979 Tax Ct. Memo LEXIS 41; 39 T.C.M. (CCH) 621; T.C.M. (RIA) 79484; December 5, 1979, Filed Zennie L. Riggs, for the petitioners. Frank D. Armstrong, Jr., for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined deficiencies in petitioners' income taxes as follows: Petitioners
Year
Deficiency
Kavi E. Morton, Jr. and
1973
$ 8,960.66
Helen L. Morton
1974
10,107.04
Harold C. Morton and
1973
8,649.66
Grace M. Morton
1974
10,136.67
*42 The issues for decision are (1) whether the transfer of property to the City of Jacksonville, North Carolina, in 1973 for use in connection with the city's water system constitutes a charitable contribution within the meaning of section 170[1] and (2), if so, the fair market value of the property. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Kavi E. Morton, Jr., and Helene L. Morton are husband and wife, who resided near Jacksonville, North Carolina, at the time of filing the petition herein. Petitioners Harold C. Morton and Grace M. Mortion are husband and wife, who also resided near Jacksonville, North Carolina, at the time of filing the petition herein. Kavi and Helene filed joint Federal income tax returns for 1973 and 1974, as did Harold and Grace, with the Internal Revenue Service Center, Memphis, Tennessee. Kavi and Harold, who are brothers, bought and sold land primarily for agricultural usage in Onslow County, *43 North Carolina. During the period commencing in March 1968 and extending through September 1970, petitioners accumulated approximately 715 acres in various tracts at Gum Branch, Richlands Township, Onslow County, North Carolina (Gum Branch Tract). Kavi and Helene owned an undivided one-half interest as tenants by the entirety and Harold and Grace owned a one-half interest as tenants by the entirety. The Gum Branch Tract is located approximately six miles northwest of the city limits of Jacksonville, North Carolina. The City of Jacksonville obtains its water for its use and for resale from underground wells. During the latter part of 1971 or the first part of 1972, the city needed an additional supply of water and sought Harold and Kavi's consent to drill test wells on sites situated on the Gum Branch Tract. The brothers consented and the wells were drilled early in 1972. The tests indicated the area would be a good site on which to drill additional city wells due to the high quality of the water and its proximity to the city. Furthermore, petitioners were the only landowners in the vicinity who had sufficient land to enable the city to acquire all the well sites needed from *44 the same owner; the well sites needed to be widely separated (at least one-half mile) in order to prevent salt water from degrading the water. Mr. Robert Wray, the City Management of Jacksonville, negotiated with the brothers on behalf of the city for the purpose of acquiring land upon which to drill additional city wells. They reached agreement in early 1973 on the location of three one-acre sites desired by the city and that the deed would contain these conditions: (1) reversion of the sites if the city abandoned the wells, (2) limitations on the style of any buildings or fences which could be constructed on the lots, and (3) the furnishing of water from the wells by the city, upon request, to supply the needs of the petitioners, as the owners of the 715 acres, and their heirs and assigns, at the same rate paid by persons within the city limits of Jacksonville. At the time, the price paid by users of city water outside the city limits was twice that paid by users within the city limits. The city then had the lots surveyed and paid for the survey. Negotiations continued over the price during April and June 1973. There was no decision that the city would pay anything for the *45 water itself, apart from the value of the land. A written appraisal, made in the context of "Well sites -- proposed," was furnished the City of Jacksonville by K. B. Hurst; it placed a value on the three lots of $12,500. Kavi then told Wray that the petitioners would be willing to donate the property to the city if he would place a separate value on the water which the petitioners considered to be fair. In July 1973, Wray furnished petitioners with a letter stating that the value of the water rights was $535,000 in addition to an appraised value of $12,500 for the three acres of land. [2] Upon receiving this letter, petitioners completed the conveyance of the three one-acre lots within the Gum Branch Tract to the City of Jacksonville for use in connection with the city's water system and subject to the foregoing three limitations (see p. 4, supra). *46 The City of Jacksonville constructed two wells with pumps and motors on each of two of the tracts and a 500,000-gallon clear well to collect and chlorinate the water on the third. It also had the right to dig two wells on the third tract. The transmission line was completed, and the city has been, and was at the time of trial, pumping water from the wells for its use and sale to others outside and inside the city limits. Morton's Dairy is a partnership owned 50 percent each by Kavi and Harold. In addition, the brothers each own 50 percent of the capital stock outstanding of Morton Farms, Inc. The primary function of Morton's Dairy is rental of land to Morton Farms, Inc., which operates the dairy farm and rents the agricultural land owned by the petitioners. In 1973, after the test wells were drilled, the petitioners sought the advice of professional land use planners to assist them in determining the best use of the Gum Branch Tract. The land use planners prepared a map showing a layout of the land for residential purposes and for a proposed golf course. In December 1973, petitioners sold approximately 45 acres of the Gum Branch Tract to Morton Farms; an additional seven *47 acres were sold to the corporation in May 1976. This land has been used by Morton Farms to develop and operate Rock Creek, an exclusive subdivision of residential houses. On January 2, 1974, Morton Farms entered into a Water Contract with the City of Jacksonville under which the corporation was to build the water distribution system in the Rock Creek subdivision and donate it to the city. The city would own the distribution system and was to repair and maintain the lines. The contract was subject to the deed for the well sites, i.e., the water was to be supplied at city rates. The contract was implemented. Morton Farms added the cost of constructing the distribution system to the basis of the subdivision lots. At the time of trial, the city was furnishing water to 29 property owners in Rock Creek. Rock Creek is the only subdivision outside the city limits of Jacksonville which has access to city water at city rates. In 1974, Morton Farms also began the construction of a nine-hole golf course. It has since added a swimming pool, tennis courts, and an additional nine holes to the golf court on approximately 150 acres of land leased from Morton's Dairy. These facilities *48 are operated by Rock Creek Golf and Country Club, a partnership of which Kavi and Harold are now equal partners. The country club uses city water for the bathroom and kitchen facilities, but its irrigation system is supplied with water from a lake in Rock Creek. At all pertinent times, the Gum Branch Tract has not been subject to any government zoning restrictions. Petitioners calculated their deductions for charitable contributions for 1973 based upon the valuation of the property transferred to the City of Jacksonville as set forth in the Wray appraisal in accordance with the provisions of sections 170(b)(1)(A) and (e)(1). The deficiencies for 1974 arise from the excess contributions for 1973 stemming from the use of such valuation. ULTIMATE FINDING OF FACT Petitioner made a charitable contribution of $12,500 to the City of Jacksonville in the taxable year 1973. OPINION Two issues are presented for decision: (1) Were the circumstances surrounding the transfer of the three acres of land by petitioners to the City of Jacksonville such as to negate the existence of a charitable contribution within the meaning of section 170; [3] (2) if they do not, what is the fair market *49 value of the property (see section 1.170A-1(c)(2), Income Tax Regs.) transferred for purposes of calculating the amount of the deductible contribution? Because of our evaluation of the testimony of petitioners' expert (Wray) and in light of the fact that petitioners have the burden of proof ( Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure), the two issues are not entirely unrelated. Such being the case, we think it advisable, under the circumstances of this particular case, to deal first with the second issue. *50 The question of valuation rests upon the evidence set forth in two appraisals. The Hurst written appraisal valued the three acres at $12,500.It did not deal separately with the value of any water rights, although it is obvious from the appraisal that Hurst was aware of the contemplated use of the property by the City of Jacksonville. Hurst did not testify, but his written appraisal was one of the stipulated documents. [4] On the other hand, not only was Wray's written appraisal stipulated, but Wray testified in support thereof at the trial. However, upon cross-examination, Wray categorically testified that he would not have recommended that the City of Jacksonville pay $547,500 for the land and water rights; that he would not have recommended that anyone else pay such amount; that he could not say hat the fair market value of the land, with whatever rights went with it, was; and that he would have paid the $12,500 for the land, including the water rights. Under the foregoing circumstances, we conclude that we can give little weight to Wray's testimony beyond a value of $12,500. [5] Such being the case, we find it unnecessary to dissect, as petitioners have done on brief, the niceties *51 of North Carolina law in respect of the transfer in question, i.e., whether land and subsurface water should be treated separately or whether they should be treated as part of a single transfer of land. Cf. Grinslade v. Commissioner,59 T.C. 566, 574 (1973); Estate of Roberts,59 T.C. 128 (1972). Despite the foregoing analysis, *52 we are satisfied that there was some additional element of value to the subsurface rights which should be taken into account. Unfortunately, however, the state of the record herein is such that we find ourselves unable to make an estimate of that value in terms of a dollar amount under the principles enunciated in Cohan v. Commissioner,39 F.2d 540, 543-544 (2d Cir. 1930). Nevertheless, we think that, in respect of one aspect of the instant case, we can and should take that value, ephemeral as it may be, into account. As a condition of the transfer of the three acres, the City of Jacksonville was required to supply water at favorable rates (the rate charged users within the city limits) to meet the needs of users located on 715 acres of land of petitioners.The record is unclear as to the number of potential inhabitants of such acreage who would benefit from the favorable rates which the city agreed to charge. However, we think it a fair inference that such number would be only a small fraction of the number of users within the city who would benefit from the additional source of water supply to be derived from the three acres. [6] In view of the foregoing and the *53 gaps in the record, which provide an inadequate basis for fixing dollar amounts either for the value of the water rights or the value of the availability of water to the potential inhabitants of petitioners' acreage, we think it not amiss for us to conclude that the value of the benefits from the use of the water from the three acres which passed to the city by means of the transfer was at least as much as the value of the reserved right of use at favorable rates, i.e., that at a minimum they ofset each other. [7] In this frame of reference, we find it unnecessary to decide whether the transfer in question was of the land and all of its subsurface elements in their totality with an undertaking by the city to supply water at favorable rates to petitioners' land or a transfer subject to the retention by petitioners of the limited right to receive water at such rates. *54 In light of the foregoing analysis, we turn to the first issue (see p. 9, supra), namely, whether the transfer of the three acres should to any extent be considered a charitable contribution. The initial impetus for the transaction came from the City of Jacksonville and its perception that the petitioners' acreage was a most likely source of a needed additional water supply for the city's water system. Clearly, there was no legal or economic compulsion upon petitioners to make the transfer such as existed in most of the decided cases. Consequently, contrary to the Court's original impression, expressed at trial, Perlimutter v. Commissioner,45 T.C. 311 (1965), is not controlling herein. The transfer of the three acres was outright subject to the three conditions previously outlined (see p. 4, supra). As to the first two conditions, namely, the possibility of reversion because of future non-use of the property as part of the city's water system and control over certain aspects of construction, we think it fair to conclude that these were sufficiently remote or incidental so as not to affect the fair market value of the land. As to the third condition, *55 we have already offset whatever value might be represented thereby against the value of the right of the city to use the water generally as part of its water system. The net result is that petitioners transferred their land with the intention of benefiting the general public and without anything in return therefor. If the contemplated transaction had taken the form of a sale or if the City of Jacksonville had condemned the property (as it had the power to do, see N.C. Gen. Stat. sec. 160A-241), petitioners would in all likelihood have received $12,500 -- the amount which, on the basis of the record herein, was its fair market value at the time of transfer. Some years ago, we comented that the meaning of the term "gift," as used in section 170, as reflected in the decided cases, represented a "thicket of subjective and occasionally ephemeral concepts." See Perlimutter v. Commissioner,supra at 317. Later decisions have done little to cause us to change that description. They have, under varying circumstances, applied standards of "detached and disinterested generosity" *56 ( Commissioner v. Duberstein,363 U.S. 278 (1960)), direct versus indirect or incidental benefit, and/or the existence of a quid pro quo. See, e.g., Allen v. United States,541 F.2d 786 (9th Cir. 1976); Stubbs v. United States,428 F.2d 885 (9th Cir. 1970); United States v. Transamerica Corporation,392 F.2d 522 (9th Cir. 1968); Singer Co. v. United States,196 Ct. Cl. 90, 449 F.2d 413 (1971); Louisville & Nashville Railroad v. Commissioner,66 T.C. 962, 1008-1010 (1976); Pettit v. Commissioner,61 T.C. 634 (1974). See also Marquis v. Commissioner,49 T.C. 695, 702 (1968). [8] We see no need to analyze the various concepts expounded in the decided cases. We are satisfied that, to the extent of $12,500, petitioners herein made a charitable contribution within the meaning of section 170 and we so hold. Decision will be entered under Rule 155. Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
2. Wray arrived at this figure by first valuing the water at 4 cents per thousand gallons. He expected the wells to operate at full capacity for 25 years, pumping water valued at $115.20 each day and with a yearly value of $42,048. Then, using the annuity tables set forth in N.C. Gen. Stat. sec. 8-47↩, he determined a value for the water rights of $535,000. Although Wray thought the system would be usable for 75 years, he found rights beyond 25 years too remote to be valued.
3. SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. (a) Allowance of Deduction.-- (1) General rule.--There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary * * *
(c) Charitable Contribution Defined.--For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of-- (1) A State, a possession of the United States, or any political subdivision of any of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes. * * *
Respondent concedes that the city is a qualified recipient of a charitable contribution under section 170(c)(1)↩.
4. Petitioners on brief make a passing reference to the fact that Hurst was subpoenaed by respondent. But, in light of petitioners' agreement to stipulate Hurst's appraisal and the absence of any objection on their part at the trial to his failure to appear or their reliance on respondent's subpoena as the reason for their not calling Hurst as a witness (at least for purposes of cross-examination), we think we may properly utilize the Hurst appraisal to the extent that we determine that it bears on the valuation issue. ↩
5. Indeed, in light of Wray's testimony, one might well conclude that his written appraisal had no other purpose than to support an income tax deduction in an amount greatly in excess of the fair market value of the property. See Scheffres v. Commissioner,T.C. Memo. 1969-41↩.
6. According to the Nineteenth Census of the United States: 1970, the population of Jacksonville, North Carolina, was 16,021. See Federal Rules of Evidence, Rule 201(b)↩. 7. Compare Judge Learned Hand's statement in Commissioner v. Maresi,156 F.2d 929, 931↩ (2d Cir. 1946): "The one sure way to do injustice * * * is to allow nothing whatever upon the excuse that we cannot tell how much to allow."
8. See also Dockery v. Commissioner,T.C. Memo. 1978-63↩.