GEORGE A. COLLMAN and MERYL COLLMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Collman v. Commissioner
Docket No. 1061-71.
United States Tax Court
T.C. Memo 1973-93; 1973 Tax Ct. Memo LEXIS 193; 32 T.C.M. (CCH) 416; T.C.M. (RIA) 73093; April 23, 1973, Filed Donn Kemble and Gary L. Taylor, for the petitioners. Melvern Stein, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION The Commissioner determined a deficiency in petitioners' income tax for 1967 in the amount of $18,978.23. At issue is the amount of charitable deduction, if any, to which petitioners are entitled in respect of real property which they conveyed to Orange County, California, for the construction of a road. 2 FINDINGS OF FACT The parties have filed a stipulation of facts which, together with accompanying exhibits, is incorporated herein by this reference. George A. and Meryl Collman are husband and wife. They filed a joint Federal income tax return for 1967 with the district director of internal revenue at Los Angeles, California. At the time their petition *194 herein was filed they resided in Yorba Linda, California. George A. Collman ("petitioner") was born about 59 years ago in Anaheim ("the City"), Ocunty of Orange ("the County"), California. His education included three years in junior college, where he studied agriculture. For most of his adult life he has been a citrus rancher in this area. During the period from approximately 1940 through 1949 petitioner purchased several orange groves in Anaheim and in the Atwood area. Atwood is an unincorporated area in the vicinity of Anaheim, Placentia and Yorba Linda. In July, 1964, one of petitioner's orange groves, having an adjusted basis of $9,386.66, was condemned by the State of California. Petitioner received net proceeds in the amount of $357,000 in respect thereof. By May 25, 1965, petitioner had reinvested $233,511.65 of these proceeds in various pieces of 3 land in this same general area. In October of 1965, petitioner acquired approximately 15 acres of real property ("the 15 acre grove") in the Atwood area of Orange County, close to the Anaheim boundary line. This property was acquired in two separate transactions. The western portion, consisting of approximately *195 7-1/2 acres, was purchased by petitioners on October 12, 1965 for $148,426 (exclusive of escrow costs) as community property. After subtracting the value of trees (at $1,100 per acre), the cost per net acre for this land was $18,429. Petitioners financed the purchase of this portion with funds other than those which they received in the condemnation proceeding, and on their 1965 Federal income tax return they did not treat this purchase as a reinvestment of the remainder of those funds. The eastern half of the 15 acre grove, also approximately 7-1/2 acres in size, was acquired by petitioner on October 27, 1965 for $158,760 (exclusive of escrow costs), as his separate property. Deducting the value of trees (at $1,100 per acre), the cost per acre of this piece of land was $19,790. On their 1965 Federal income tax return petitioners treated this purchase as replacement property for the grove which had been condemned, using up the remainder of the proceeds from that condemnation plus $35.435.95 of additional cash. 4 The 15 acre grove was a generally rectangular piece of property, approximately 625 feet wide and 1,000 feet long. On the south it was bounded by Orangethorpe Avenue *196 (a basically east-west street), and it extended northward for its length. On the east and west it was bounded by groves owned by Horace Morlock. A street named Orchard Drive originated north of the 15 acre grove and ran south until it reached approximately the center of the northern border of the grove. From that point it turned and ran east, forming the northern boundary of the eastern portion of the grove. It continued running east for approximately 690 feet, at which point it again turned south, eventually terminating at Orangethorpe Avenue. (Orchard Drive was subsequently renamed Kellogg Drive, but for convenience it will be referred to by its original name.) Just south of Orangethorpe, running approximately parallel to it, was a railroad track of the A.T.&S.F. Railroad. By letter dated December 27, 1965, the Department of Real Property Services of Orange County requested the Road Commissioner and County Surveyor to acquire a right of way through petitioner's property for a realignment of Orchard Drive. The proposed realignment consisted of the elimination of the 90 degree turn when the street reached the northern 5 boundary of petitioner's property. Instead, it was *197 to be extended due south from that point, passing through the middle of petitioner's property, approximately along the line which divided the eastern and western portions of the grove, until it reached Orangethorpe Avenue. It was planned that Orchard Drive would eventually be 80 feet wide (its "ultimate width"), consisting of four lanes plus a parking lane on each side bounded by curbs and gutters. However, the traffic requirements of the area did not justify such construction at that time, and the initial plan, therefore, was to construct the new portion to a 60 foot width (its "interim width"), consisting of two paved lanes 24 feet wide and graded earth shoulders. Accordingly, the County sought to obtain from petitioners a strip of land that was only 60 feet wide. For the purpose of determining just compensation to petitioner for the property to be used in constructing the new street to its interim width, the County hired an independent appraiser, Duane A. Armstrong, to value petitioner's property. Armstrong submitted his appraisal on March 15, 1966, using a valuation date of March 5, 1966. The total amount of land out of the 15 acre grove that was required to construct the *198 new street to its interim width was 1.483 acres, of which .367 6 acres were burdened by a sewer easement and 1.116 acres were not so burdened. Armstrong used a value of $20,000 per acre for the 1.116 acres which were not subject to the sewer easement, and $10,000 per acre for the remaining .367 acres. In addition he treated the trees as having a value of $1,100 per acre, and placed an aggregate rounded value of $1,500 on the trees that would be affected by the construction. The total for land and trees was thus $27,490, to which he added $3,960 as severance damages for the relocation of a utility pole and an irrigation line, making a total of $31,450 as "just compensation" for the taking of the 1.483 acres. Although he recognized that the construction of the road would result in the loss of a windbreak (without which oranges would be blown off the trees and those remaining might be of a poorer quality), which he valued at approximately $2,100, he did not recommend any compensation therefor, because in his judgment the benefits to the property from having a paved street running through it would offset damages suffered by reason of loss of the windbreak. As to the offsetting street *199 improvement, his report stated: "Street improvements will not be of value to owner for citricultural purposes, however, use should furnish a better view of his property for potential buyers." 7 When the 15 acre grove was acquired, and through the period of this appraisal, it was zoned as a "general agricultural district", and was being used for agricultural purposes. Petitioner intended to continue growing oranges on this property for a period of 5 to 10 years, after which time he would consider a sale or lease of the property. Accordingly, he meanwhile took certain steps to improve the orange production of the grove, including reforming the ridges to direct irrigation water, establishing lanes through which trucks could drive to pick the oranges, and planting new orange trees. While much of the area surrounding the 15 acre grove was zoned as "general agricultural" and was being used for agricultural purposes, it was in a state of gradual transition to subdivisions of single family dwellings. However, this area was developing at a slower pace than the rest of the Anaheim region. Generally, Anaheim was expanding more rapidly in a direction away from petitioner's 15 acre *200 grove. Still, there was some construction going on around petitioner's grove. Thus, as of the time of the appraisal, a housing development of single family homes which were about four years old was located approximately 600 feet east of the 15 acre grove, and another development of single family dwellings which were one 8 to three years old was located approximately 600 feet west of the grove. Petitioner was familiar with the Anaheim-Atwood area, and was aware of these developments. Moreover, the Orchard Elementary School was located approximately 600 feet north of the property, and there was a proposal to build a high school on the corner of Orchard Drive where it turned and ran east at the northen boundary of petitioner's property. The presence of the high school would increase the value of petitioner's property for commercial development purposes. Finally, the area south of Orangethorpe Avenue was zoned as a "light industrial district." On March 30, 1966, shortly after the appraisal by Armstrong, petitioner discussed the condemnation proceedings [1] with County agents, Messrs. Pftemlin and Tolleria. This discussion was confirmed by a letter to petitioner dated April 5, 1966. *201 In May of 1966, the County decided to hold in abeyance the realignment of Orchard Drive, pending a redesigning of the proposed road. During this period of "abeyance", on April 10, 1967, petitioner sold one of his other groves for $426,718.36, realizing a long term capital gain of $371,537.16. 9 In May of 1967 the County, through Susumu Miyashiro, a real property agent employed by the County, notified petitioner that it was then prepared to proceed with the realignment of Orchard Drive. During the initial discussions between petitioner and Miyashiro, the possibility of petitioner's dedicating to the County the land necessary to construct Orchard Drive to its ultimate width (80 feet), in exchange for the County's performing the full construction work, was discussed. Petitioner had first inquired as to the possibility of this arrangement in his discussion with Armstrong concerning the latter's appraisal of petitioner's 15 acre grove. In June of 1967, Miyashiro notified petitioner that the County was also planning to expand Orangethorpe Avenue from its then 50 foot width to a "new interim width" of *202 70 feet, still 25 feet short of its ultimate width of 95 feet. With respect to Orangethorpe Avenue, petitioner and Miyashiro also discussed the possibility of petitioner's dedicating to the County the land necessary for construction to its ultimate width, in exchange for the County's performing the full work, including the construction of curbs and gutters. Petitioner was interested in dedicating the additional property along Orangethorpe since he felt he needed a "tax offset" that year, due to the large capital gain he had realized on the 10 sale of one of his groves. Moreover, he wished to avoid going through a series of condemnation suits. On July 17, 1967, petitioner met with Miyashiro in the latter's office, and Miyashiro made two offers to petitioner on behalf of the County. The first proposal involved the construction of Orchard Drive to its interim width, with a payment to petitioner of $29,480 in respect thereof. The second proposal involved petitioner's dedicating to the County the 80 foot strip necessary to construct Orchard Drive to its ultimate width, in return for the County's paving the street to this width (including curbs and gutters) and paying petitioner *203 $5,810 for the relocation of petitioner's irrigation pipeline. The Orangethorpe dedication was again discussed. On October 24, 1967, the petitioners and the County entered into a "Road Agreement". This agreement recited, in part, that WHEREAS, COUNTY has projects for the realignment of Orchard Drive to interim width and the widening of Orangethorpe Avenue to interim width, and WHEREAS, COUNTY desires to construct these roads to ultimate width, and WHEREAS, GRANTORS are willing to dedicate all rights of way required for said ultimate width construction, and WHEREAS, GRANTORS need to be compensated for the relocation or rehabilitation of certain facilities affected by the proposed projects. 11 NOW, THEREFORE, in consideration of these premises, the parties hereto mutually agree as follows: Thereafter the agreement provided that the County would pay the petitioners $3,825 for landscaping and for the relocation of fencing and the rehabilitation of an irrigation pipeline system, would relocate a power pole leading to petitioners' wind machine, and would pave Orangethorpe and the realigned Orchard Drive to their ultimate widths, including the construction of curbs and *204 gutters. In return, petitioners would convey to the County sufficient land to construct Orangethrope and the realigned Orchard Drive to their ultimate widths, and would agree to the dismissal of any eminent domain action filed in respect of the property. Grant deeds, reflecting the conveyance of the property, were prepared, executed, and delivered to the County. These deeds were duly recorded on November 7, 1967. As a result of the "Road Agreement" petitioners conveyed to the County 2.549 acres of land. Of these 2.549 acres, 1.483 would have been required by the County to build realigned Orchard Drive to its interim width, and .276 acres would have been required to expand Orangethorpe to its proposed new interim width. If the latter .276 acres were valued at the same rate as the other acreage in the 15 acre grove, pursuant to the 12 Armstrong appraisal (i.e., $20,000 per acre for land plus $1,100 per acre for orange trees), they would have a value of $5,824 ($5,520 for land plus $304 for trees). Indeed, in a "Transaction Memorandum" dated September 28, 1967, Miyashiro did value the land at this rate. The additional land conveyed to the County by petitioner, which would not *205 have been condemned by the County under its original plan to build Orchard Drive to interim width and expand Orangethorpe to a new interim width (i.e., the difference between the interim and ultimate widths), amounted to .79 acres. If this land were also valued at the rate used by Armstrong, it would have a fair market value of $16,669 ($15,800 for the land and $869 for the orange trees). The additional cost to the County attributable to the paving of Orchard Drive and Orangethorpe to their ultimate, rather than interim, widths and to the construction of curbs and gutters, was $20,711, $17,380 of which was attributable to Orchard Drive and $3,331 to Orangethorpe. In 1969, Morlock, who owned the property which bordered on the 15 acre grove on the east and west, entered into an option agreement with a builder named Ettelson who desired to subdivide Morlock's west property and to build single family residences thereon. Pursuant to this plan Ettelson asked the 13 firm of Millet, King and Associates, Inc., a corporation involved in land planning and civil engineering, to determine how this property could best be subdivided into lots. Jeffrey Millet, a licensed land surveyor, undertook *206 this project, and it was determined that Morlock's property, because of its width, did not provide a sufficiently profitable lot yield. In order to remedy this, Millet proposed that Morlock trade a small piece of his property, approximately 1.3 or 1.4 acres in size, for a small piece of petitioner's property, which was approximately the same size. The end result of this trade would be to enable Morlock to more profitably subdivide his property. Accordingly, Morlock approached petitioner with this deal. Petitioner acquiesced, and the trade took place. During this period of time, Morlock and Ettelson had also begun negotiations with the City. The purpose of these negotiations was to have the City annex Morlock's property and grant a zoning change to allow the construction of single family dwellings thereon. It was necessary to become part of the City and to meet the City zoning regulations, because only the City could supply sewer, water and power facilities in this area. All of these become important when the construction of single family dwellings, or other commercial development, is being considered. During negotiations with the City 14 it became clear that the City *207 considered Morlock's property to be too small, and that it would not take the requested action unless part of petitioner's property were also included in the annexation. With this in mind, Morlock approached petitioner. By March 12, 1969, petitioner had joined in Morlock's request to the City, and that portion of petitioner's 15 acre grove located west of realigned Orchard Drive was included as part of the subject property in this request. Shortly thereafter, Millet suggested to petitioner that this would be a good time to obtain C-1 (general commercial) zoning for the northwest corner formed by the intersection of Orangethorpe and realigned Orchard Drive on petitioner's property. Accordingly, on July 25, 1969, George Collman and Millet petitioned the City for reclassification of this corner. The question of the potential use of the corners created by the intersection of realigned Orchard Drive and Orangethorpe had initially arisen during Armstrong's appraisal of the 15 acre grove. Armstrong attributed no additional value to these corners, stating that, "Investigation disclosed that opening [of realigned Orchard Drive] does not change indicated Uses on Yorba Linda Master Plan, *208 or guarantee Service Stations on corners." However, on April 11, 1966, Jack Young, an appraiser and Assistant Director of the 15 Evaluation Division for the County reviewed Armstrong's appraisal and disagreed with this conclusion. He felt that the creation of these corners gave petitioner a special benefit of approximately $19,000, because of their potential use as service station sites. Petitioner and Millet, in their application to the City for C-1 zoning, also had in mind the potential use of that corner as a service station site. Later discussions between petitioner, Millet and City officials indicated that approval by the City for this use was very doubtful. However, it was indicated that the possibility of approval of this northwest corner for a neighborhood shopping center site was far more likely. Morlock's sale of his property to Ettelson failed to close. The reason for this failure is unclear; however, Millet urged Morlock and petitioner to continue their efforts to obtain annexation to the City and a zoning reclassification, so that zoning problems would not stand in the way of any future sale. Accordingly, petitioner and Morlock continued in those petitions to *209 the City for annexation and reclassification originally begun at Ettelson's urging. In addition, on August 14, 1969, Collman and Millet petitioned the City for reclassification of that portion of Collman's 15 acre grove located east of realigned Orchard Drive.The proposed 16 reclassification was to residential and C-1 commercial zoning. In the C-1 area petitioner was considering the possibility of a service station. Sometime prior to December, 1969, petitioner modified his petition to the City with respect to the northwest corner at the intersection of realigned Orchard Drive and Orangethorpe. The modified proposal reduced the amount of land for which petitioner was requesting C-1 zoning. Before it would grant a petition for reclassification, the City required that certain road construction conditions be met. These conditions, at least for that portion of Orchard Drive which ran through petitioner's property, were slightly more extensive than those of the County. Thus, while the construction work done by the County on this road completely satisfied the County's requirements, it only partially satisfied the City's. Therefore, the City required petitioner to dedicate an additional *210 10 feet of right of way to it, 5 feet on each side of the center line of Orchard Drive. This additional 5 feet was to be used for sidewalks, the construction of which would have to be guaranteed by anyone developing the property. Indeed, had the County not already built Orchard Drive to an 80 foot width, the City woudl have required a developer to do all road construction work, beyond the center 24 feet of paving, to the full 90 foot width required by the City. 17 On January 6, 1970, the Anaheim City Council approved petitioner's and Morlock's petitions for reclassification with respect to that property located west of realigned Orchard Drive. The corner at the intersection was zoned City C-1, General Commercial, while the remainder was zoned City R-2-5000, Single Family Residential. On March 10, 1970, the Anaheim City Council approved petitioner's and Morlock's petitions for reclassification with respect to that property located east of realigned Orchard Drive. Part of this property was zoned R-2-5000, Single Family Residential, and the remainder was zoned R-3 Multiple Family Residential (i.e., allowing the construction of apartment buildings of up to 30 units per acre). *211 Collman and Morlock had previously amended their petitions to eliminate a request for C-1 zoning on this land. On May 24, 1971, petitioner sold approximately five acres of the 15 acre grove. Of these five acres, roughly two were from the western portion of the grove, and petitioner received $66,300 for them. The remaining acres were from the eastern portion of the grove, and petitioner received $113,300 for them. Petitioner had continued to raise oranges on the 15 acre grove during this time. However, while in earlier years his farming operations had been profitable, from 1966 on he had experienced losses in this respect. The following chart reflects petitioner's net farm income for the years 1961 through 1971. 18 1961
1962
1963
1964
1969
1970
1971
GROSS FARM INCOME
$38,876.35
$34,675.39
$64,073.48
$31,936.23
FARM EXPENSES
25,089.47
11,882.93 24,076.64
15,241.42
NET FARM INCOME
$13,786.88
$22,792.46
$39,996.84
$16,694.81
(Loss)
($2,636.00
1965
1966
1967
1968
1969
GROSS FARM INCOME
$36,184.20
$30,755.15
$34,979.14
$33,368.00
FARM EXPENSES
32.627.14
34,939.49
54,580.46
41,519.00
NET FARM INCOME
$3,557.06
($4,184.34)
($19,601.32)
($8,151.00)
(Loss)
($2,636.00
*212 1969
1968
GROSS FARM INCOME
$17,834.00
$15,776.00
$55,707.00
FARM EXPENSES
37,495.00
34,849.00
58,343.00
NET FARM INCOME
($19,661.00)
($19,
($19,073.00)
(Loss)
($2,636.00 19 In their 1967 Federal income tax return petitioners claimed that they had donated 2.549 acres of land to the County, receiving in return nothing "other than [the] promise of certain future improvements to roads". These 2.549 acres included the .79 acres which represented the difference between the interim and ultimate widths of Orchard Drive and Orangethorpe. Petitioners determined that the market value of this land was $49,710.02. This figure was derived by valuing the .367 acres subject to the sewer easement at $10,000 per acre, and the remaining 2.182 acres not so subject at $21,100 per acre (apparently at the rate of $20,000 per acre for the land plus $1,100 per acre for the trees). They then offset against this amount $20,711 as "Value of Future improvements per County of Orange", thus obtaining a "Net Contribution" of $28,999.02. (The $20,711 represents the additional cost to the County of paving Orchard Drive and Orangethorpe to their ultimate, rather *213 than just their interim, widths, including the construction of curbs and gutters. The cost of relocating petitioner's power pole and cash payments made to petitioner are not included in this figure.) They then deducted this $28,999.02 as a charitable contribution. 20 In his deficiency notice to petitioners, the Commissioner disallowed the entire amount of the claimed charitable deduction in respect of the land donated to the County, on the ground that "The strips of land transferred to the County of Orange were equal to the fair market value of the improvements made to the remaining property by the County". In their petition, the Collmans claim not only that the Commissioner erred in disallowing the $28,999.02 charitable deduction, but that such deduction should have been $21,114,98 greater, and they seek a refund in respect thereof. 21 OPINION RAUM, Judge: On their 1967 return petitioners reported a gift of 2.549 acres of land for road purposes to Orange County which they valued at $49,710.02, and, after subtracting $20,711 therefrom as the "[value] of future improvements" to be made by the County, they claimed a deduction in the net amount of $28,999.02. [2] The *214 Commissioner disallowed the deduction in its entirety, and petitioners now claim that they are entitled to an even larger deduction, namely, in the full amount of $49,710.02 as originally reported without any reduction on account of improvements by the County. The matter is one that turns largely upon the peculiar facts that were developed in a somewhat confusing record. For reasons hereinafter indicated, we hold that petitioners are entitled to a deduction, but in an amount that is lower than that originally claimed by them. *215 22 It is well settled that the term "charitable contribution" as it is used in section 170 is synonymous with the word "gift". Harris W. Seed, 57 T.C. 265, 275; Larry G. Sutton, 57 T.C. 239, 242; Harold E. Wolfe, 54 T.C. 1707, 1713; Harold DeJong, 36 T.C. 896, 899, affirmed 309 F. 2d 373 (C.A. 9). "A gift is generally defined as a voluntary transfer of property by the owner to another without consideration therefor. If a payment proceeds primarily from the incentive of anticipated benefit to the payor beyond the satisfaction which flows from the performance of a generous act, it is not a gift". Harold DeJone, supra, 36 T.C. at 899. Stated somewhat differently, the transfer does not constitute a gift where it is made "in the expectation of the receipt of certain specific direct economic benefits whithin the power of the recipient to bestow directly or indirectly * * *". Stubbs v. United States, 428 F. 2d 885, 887 (C.A. 9). It is also recognized, however, that "* * * it may be possible *216 to combine a gift to charity with a payment in exchange for consideration flowing to the contributor, and in such situation a deduction may be allowable to the extent that the payment exceeds the consideration". Harris W. Seed, supra, 57 T.C. at 278. See Edward A. Murphy, 54 T.C. 249, 254; Harold DeJong, supra, 36 T.C. at 899-900. Cf. Jordon Perlmutter, 45 T.C. 311, 319. Indeed, this would seem to be the theory behind the 23 so-called "bargain sale" cases, where charitable organizations purchase property for a price below its fair market value, and sellers are allowed "charitable contributions" for the difference between the fair market value and the price paid. See William Waller, 39 T.C. 665, 677. [3] Cf. Elisian Guild Inc. v. United States, 412 F. 2d 121, 125-126 (C.A. 1); Rev. Rul. 69-39, 1969-1 C. B. 148. These "bargain sale" cases are very similar to the instant case, where petitioners and the County reached an "arm's length" agreement pursuant to which petitioners received certain consideration. *217 The record before us is unusual, and a realistic understanding of the case requires us to consider the matter in two parts, first, with respect to the property on which the County sought to construct Orchard Drive to its interim width (1.483 acres) and to expand Orangethorpe to a new interim width (.276 acres), and, second, with respect to the additional property (.79 acres) needed to expand both streets to their ultimate widths, which the County was not then seeking but which it was willing to accept under the favorable terms proposed by petitioner. For reasons to be outlined shortly, it is our 24 judgment, first, that petitioners could have received cash consideration from the County in respect of the property required for the interim widths of both streets and that the transfer of such parcels constituted a gift subject to diminution only to the extent that petitioners received consideration under their contractual arrangements with the County, and, second, that since petitioners, in order to obtain desired zoning changes, would have been required to dedicate without any consideration the additional strips of land to expand the streets to ultimate width, the transfer of such *218 strips cannot be considered a gift at all. And, finally, since petitioners imposed as a condition that the streets be paved to their ultimate widths together with curbs and gutters the cost of such improvements in the context of this case represents consideration received by petitioners which must be subtracted from the gift which they made. The County was ready to condemn 1.483 acres of petitioner's land for the construction of Orchard Drive to its interim width. Its plans had progressed to the point where it had offered petitioners $29,480 [4] in respect of this land. 25 Indeed, based upon Armstrong's valuation, which the County appeared to accept and which we find to be sound, the fair market value of that property was $27,490 (exclusive of severance damages of $3,960 for relocation of an irrigation line, etc.). Moreover, the County was planning in the immediate future to expand Orangethorpe to its new interim width, requiring *219 a condemnation of an additional .276 acres of petitioners' land. The fair market value of this latter property, based upon criteria used in Armstrong's appraisal, was $5,824. With respect to the Orchard Drive property, petitioners could simply have accepted the County's offer and they would have received $29,480. Similarly, we are satisfied on this record that they would have received $5,824 with respect to the property needed to expand Orangethorpe to its new interim width. Moreover, had petitioners simply accepted the County's offer with respect to Orchard Drive, the realigned road would have been built, albeit to its interim width and without curbs and gutters, the corners at the intersection of Orchard and Orangethorpe would have been created, and any appreciation in the value of petitioners' property due solely to the presence 26 of the road through it would have occurred. [5] Instead, petitioners and the County negotiated a bargain whereby petitioners donated to the County the 1.759 acres which would have been taken by the County for the interim width expansion of Orangethorp and Orchard, plus an additional .79 acres to allow the construction of these streets to their ultimate *220 widths. In return the County paid petitioners $3,825 (obviously in respect of severance damages), and agreed to pave both of these roads to their ultimate widths and to construct curbs and gutters. With respect to the initial 1.759 acres, there was clearly a charitable contribution by petitioners to the County. The value of this contribution is the fair market value *221 of this land, which in our judgment is equal to the amount of money petitioners would have received as condemnation awards for their property (exclusive of severance damages), or $33,314 ($27,490 for the 1.483 acres and $5,824 for the .276 acres). 27 Cf. Jordon Perlmutter, supra, 45 T.C. at 318. Petitioners could have received at least $29,480 by simply accepting the County's offer in respect of Orchard Drive alone. Instead, they chose to donate the land to the County. However, they did receive certain consideration in conjunction with this donation, and such consideration must be offset against the amount donated to determine the value of the charitable contribution. Petitioners donated an additional .79 acres of land to induce the County to construct the roads to their ultimate widths. As part of the bargain the County constructed improvements on this land which cost $20,711. This represents the additional cost to the County of paving Orchard and Orangethorpe to their ultimate widths and constructing curbs and gutters, over the cost of simply paving these roads as if they had been built only to their interim widths. The County was not ready to expand these *222 roads to their ultimate widths in 1967. Traffic in the area did not require such expansion, and it is unknown when in the future the County would have been ready to construct them to their ultimate widths. The only reason the County constructed them to ultimate width at that time was because of the bargain it made with petitioners. Petitioners were aware of the County's attitude in this matter. They were also aware that if they ever wished to develop the 15 acre 28 grove in the future they would need a zoning reclassification. We are satisfied on this record that before such a reclassification would be granted, by either the County or the City, they would have to dedicate to whichever entity they were dealing with the .79 acres (plus some additional acreage in the case of the City) and guarantee, or have a developer guarantee, at least that much construction work as was performed by the County. Thus, the effect of the transfer of this .79 acres was to help make petitioners' land useable for subdivision or commercial purposes in the future. Accordingly, petitioners are not entitled to a deduction for the value of this land. See Larry G. Sutton, supra, 57 T.C. at 244. *223 [6]
Moreover, since those improvements constructed by the County on the .79 acres would have had to be guaranteed by petitioners or a developer to obtain a zoning reclassification, a developer having to guarantee this construction work would most likely have adjusted accordingly the price he would be willing to pay petitioner for his property. In addition, it is clear from the facts that development of the 15 acre grove was not far off. Thus, by early 1969 petitioner had joined at least part of his land with Morlock's in an 29 application to the City for annexation and reclassification. This development can only have been hastened by the series of losses petitioner had suffered in his operation of the grove, which showed no sign of abating. Thus, the $20,711 cost of the additional construction work performed plainly represents consideration flowing to the petitioners. [7] When this amount is offset against the total value of petitioners' charitable contribution ($33,314) we arrive at the *224 amount of their allowable charitable deduction - $12,603. [8]
*225 Petitioners have argued on brief that they are entitled to a deduction for a charitable contribution equal to the fair market value of all of the land, including the extra .79 acres, which they transferred to the County, without any offset for consideration received by them. For the reasons stated above, we have rejected this argument, and accordingly, Decision will be entered under Rule 50. Footnotes
1. The record does not disclose when these proceedings were commenced. ↩
2. The deduction was claimed under section 170, I.R.C. 1954, which provides: SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. (a) Allowance of Deduction. - (1) General rule. - There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. * * *
* * *
(c) Charitable Contribution Defined. - For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of - (1) A State, a possession of the United States, or any political subdivision of any of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes. ↩
3. See also, Richard S. Dinner, T.C. Memo. 1973-43↩; Gladstein v. United States, 68-1 U.S.T.C. Par. 9197 (E.D. Okla.), appeal dismissed on motion (C.A. 10). 4. All the components of this figure are not shown in the record, but there is some indication that it included $3,480 for severance damages. Moreover, the aggregate amount could well have represented an opening figure for bargaining purposes. ↩
5. Thus, because of this unusual situation we must reject respondent's argument that enhancement in value by reason of the new road and creation of the corners was a bargained for or contemplated economic benefit flowing from the so-called gift that must be offset against it. To the extent that such benefit accrued it was available to petitioners by merely accepting the County's offer to buy the land for cash or to await the conclusion of condemnation proceedings and receive just compensation therein. Moreover, we are far from convinced that petitioners received any net benefit as a result of the foregoing. We heard troubling evidence that the construction of Orchard Drive through petitioners' property was disadvantageous, and that any increase in value due to the corners was highly conjectural and remote. ↩
6. Petitioner also avoided a series of condemnation suits by making this additional donation of land. Cf. United States v. Transamerica Corp., 392 F. 2d 522↩ (C.A. 9). 7. We have not included in addition the $3,825 cash paid to petitioners, because it obviously represented compensation for severance damages such as the rehabilitation of irrigation lines required by the road construction and did not represent anything new of value to petitioners. In like manner, we have not included severance damages in computing the value of petitioners' property. Consistency requires that such damages be excluded from both figures. ↩
8. Charles O. Grinslade, 59 T.C. , is consistent with the result that we reach in this case. There, the petitioners made a conveyance with the expectation of receiving commensurate financial benefits. As the Court stated, "[petitioners] began with 1.195 acres of land, part of which had the potential of being developed as a service station site, and part of which was excess land of negligible utility and value. In the end they still had the service station site, together with all the necessary approvals from the city for the development of the site, and $10,000 in cash in place of the excess land. Petitioners and the city had reached a compromise advantageous to both - a quid pro quo." 59 T.C. at . No such commensurate "quid pro quo" exists here, as we have found that the value of petitioners' contribution is substantially in excess of the value of the consideration flowing to them. They received no zoning reclassification, and they gave up land with very real economic value. Cf. footnote 5, supra. Moreover, insofar as the existence of a "charitable intent" represents an independent requirement for a charitable contribution, cf. Grinslade, 59 T.C. at , we find that petitioners did have such intent with respect to the excess of the value of the 1.759 acres necessary to expand Orchard and Orangethorpe to their interim widths ($33,314) over the value of the consideration they received ($20,711). ↩